UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

SHAHRIYAR M.,[1]

      Petitioner,

  v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security
Administration,[2]

      Respondent.

Case No. 1:20-CV-00425-CWD

**MEMORANDUM DECISION
AND ORDER**

## INTRODUCTION

Pending before the Court for consideration is Shahriyar M.'s Petition for Review of the Respondent's denial of social security benefits, filed on August 5, 2020. (Dkt. 1.) The Court has reviewed the Petition for Review, the parties' memoranda, and the administrative record (AR), and for the reasons that follow, will reverse the decision of the Commissioner and remand this matter for an award of benefits.

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Kilolo Kijakazi is substituted for Andrew Saul pursuant to Federal Rule of Civil Procedure 25(d). Kijakazi became the Acting Commissioner of Social Security Administration on July 9, 2021.

# BACKGROUND

On March 22, 2017,[3] Petitioner protectively filed a Title XVI application for supplemental security income, claiming disability beginning March 1, 2016. The application was denied initially and on reconsideration, and a hearing was conducted on June 20, 2019, before Administrative Law Judge (ALJ) Christopher Inama. At the hearing, Petitioner amended the alleged onset date of disability to March 22, 2017. After considering testimony from Petitioner and a vocational expert, ALJ Inama issued a decision on July 10, 2019, finding Petitioner had not been under a disability since the alleged onset date through the date of the written decision.

Petitioner timely requested review by the Appeals Council, which denied his request for review on July 1, 2020. Petitioner timely appealed this final decision to the Court on August 26, 2020.

The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g). At the time Petitioner filed his application on March 22, 2017, he was twenty-nine years of age. Petitioner's educational background is unclear, as he was admitted to the United States as a refugee from Iran on September 8, 2016. (AR 30, 254.) Petitioner speaks Farsi and he is taking English as a second language classes. (AR 58.) He was assisted by a translator during the hearing before the ALJ. (AR 51, 55.)

---

[3] The ALJ's written determination mistakenly refers to the application date as March 15, 2017. (AR 31.) According to the record, Petitioner filed his application on March 22, 2017. (AR 54, 254.)

**MEMORANDUM DECISION AND ORDER - 2**

## STANDARD OF REVIEW

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports Petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

**DISCUSSION**

The following issues are raised on appeal:

1.    Whether Petitioner's right lower extremity deformity and cerebral palsy met or equaled the criteria of Listing 1.02 or 11.07?

2.    Whether the ALJ properly evaluated the medical opinions?

3.    Whether the ALJ properly evaluated Petitioner's subjective symptom testimony?

4.    Whether the ALJ's RFC assessment is supported by substantial evidence?

The Court has reviewed the record, and finds that the ALJ committed error at step three when he evaluated Listing 1.02, which considers disability due to major dysfunction of a joint. Because this issue is dispositive of the appeal, the Court will not consider Petitioner's other challenges to the ALJ's decision.

**ANALYSIS**

**1.   The ALJ's Findings**

At step two, the ALJ found Petitioner has the following severe impairments: "right hemiplegic cerebral palsy resulting in joint dysfunction (right hip dysplasia, mild right knee degenerative changes, right club foot status/post surgery), depressive disorder, anxiety disorder, and somatic symptom disorder." (AR 17.) At step three, the ALJ determines whether a claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 416.920(d), 416.925 and 416.926. If a claimant's impairment or combination of impairments meets or medically equals the criteria for one

of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled. At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity… [and] the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

The ALJ determined Petitioner did not have an impairment or combination of impairments which met or were medically equal to either Listing 1.02 (Major disfunction of a joint) or Listing 11.07 (Cerebral palsy). The ALJ indicated he considered Petitioner's right hemiplegic cerebral palsy resulting in joint dysfunction, but "his medical records demonstrate insufficient evidence of involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, OR involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively." (AR 19.) The ALJ based his determination on Petitioner's medical records from 2016, which "indicate he stood and walked up to one kilometer without an assistive device." Although the ALJ acknowledged Petitioner's condition later worsened, the ALJ noted Petitioner underwent right ankle surgery that "should improve his walking/standing ability as he recovers." (AR 19.)

The ALJ determined Petitioner retained the RFC to perform sedentary work, with significant postural limitations as follows: "with his right lower extremity, he can never push, pull, or operate foot controls….He can never climb ladders, ropes, or scaffolds or

walk on uneven surfaces, but he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl…." (AR 20-21.) In reliance upon testimony from the vocational expert, the ALJ determined, at step five, that Petitioner would be able to perform the requirements of representative occupations such as final assembler, dowel inspector, and stuffer. (AR 31.) Further, the ALJ found that the "use of a wheelchair, four-wheeled walker, or leg brace/cast would not preclude these jobs." (AR 31.)

Petitioner objects to the ALJ's step three conclusion. He argues the ALJ failed to consider the evidence in the record establishing Petitioner's inability to ambulate effectively, as measured by objective testing and observation of Petitioner's ability to walk, thereby challenging the ALJ's findings with respect to Listing 1.02.[4]

Respondent counters that Petitioner failed to satisfy his burden of proving he met Listing 1.02. Respondent argues that, to meet Listing 1.02, Petitioner must show he was unable to walk without the use of a hand-held assistive device that limits the functioning of both upper extremities to satisfy the requirement of ineffective ambulation. Respondent contends that substantial evidence supports the ALJ's findings, because Petitioner reported he was independent, did not use an assistive device to walk, and he reportedly could walk about 1 kilometer. Upon review of the full record, the Court finds Respondent's arguments are without merit.

---

[4] Respondent challenged also the ALJ's findings regarding Listing 1.07. Because the Court finds the error with regard to the ALJ's consideration of Listing 1.02 dispositive, the Court does not reach Petitioner's challenge to the ALJ's findings regarding Listing 1.07.

**MEMORANDUM DECISION AND ORDER - 6**

### 2.  Listing 1.02 – Major Dysfunction of a Joint[5]

Listing 1.02 characterizes major dysfunction of a joint due to any cause as:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> or
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

The inability to ambulate effectively means "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Listing 1.00B2b(1).

---

[5] Listing 1.00 encompasses various disorders of the musculoskeletal system, and contains several categories of impairments. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.00 (Musculoskeletal Disorders – Adult) (Effective: May 22, 2018 to September 23, 2019). The specific category of impairment at issue in this case is Listing 1.02. The listing has been amended since the time of the ALJ's written determination issued on July 15, 2019.

**MEMORANDUM DECISION AND ORDER - 7**

Included in a list of nonexhaustive examples of the inability to ambulate effectively are the following:

> [T]he inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Listing 1.00B2b(2).

"The inability to ambulate effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone." Listing 1.00B2a. The Listing encourages the consideration of medical records over a significant period of time. "[A] longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment unless the claim can be decided favorably on the basis of the current evidence." *Id*. at Listing 1.00H1.

The medical examination of a claimant who uses a hand-held assistive device requires the following:

> When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, examination should be with and without the use of the assistive device unless contraindicated by the medical judgment of a physician who has treated or examined the individual. The individual's ability to ambulate with and without the device provides information as to whether, or the extent to which, the individual is able to ambulate without assistance. The medical

> basis for the use of any assistive device (e.g., instability,
> weakness) should be documented. The requirement to use a
> hand-held assistive device may also impact on the
> individual's functional capacity by virtue of the fact that one
> or both upper extremities are not available for such activities
> as lifting, carrying, pushing, and pulling.

Listing 1.00J4.

The ALJ is instructed to "determine whether an individual can ambulate effectively…based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2)...." Listing 1.00B2a. "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." Listing 1.00B2b(2). "The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id*.

In sum, the Listing requires the ALJ to assess the presence of the following four criteria:

1. A gross anatomical deformity;

2. Chronic joint pain and stiffness with signs of limitation of motion;

3. Medical imaging of joint space narrowing, bony destruction or anklyosis; and

4. An inability to ambulate effectively.

**MEMORANDUM DECISION AND ORDER - 9**

Listing 1.02A. If all four criteria are satisfied, the claimant is "presumed to be disabled." *Bowen*, 482 U.S. at 141. If all four criteria are not satisfied, the ALJ is required to continue to step four of the evaluation process. *See Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013).[6]

Here, Respondent does not contest that Petitioner's right lower extremity deformity satisfies the first three criteria of Listing 1.02A. Thus, the only issue is whether Petitioner retains the ability to ambulate effectively.

### 3. Medical History

Shortly after arriving in the United States, Megan Gullickson, DPT, evaluated Petitioner on October 27, 2016. (AR 487.) Petitioner reported being able to stand for a maximum of 20 minutes and walk for a maximum of ½ mile with rest breaks and occasional falls. *Id.* Although Petitioner ambulated into the clinic without an assistive device, Gullickson observed "obvious difficulty and gait abnormalities" due to right ankle supination, lower extremity internal rotation, and ankle plantarflexion and inversion. *Id.* Petitioner was weight bearing on the distal, lateral border of the right foot. *Id.* Gullickson assessed Petitioner's ability to stand, which Petitioner was able to do "with

---

[6] *Kennedy* sets forth the five-step process as follows: "The five-step process for disability determinations begins, at the first and second steps, by asking whether a claimant is engaged in 'substantial gainful activity' and considering the severity of the claimant's impairments. *See* 20 C.F.R. § 416.920(a)(4)(i)-(ii). If the inquiry continues beyond the second step, the third step asks whether the claimant's impairment or combination of impairments meets or equals a listing under 20 C.F.R. pt. 404, subpt. P, app. 1 and meets the duration requirement. *See id.* § 416.920(a)(4)(iii). If so, the claimant is considered disabled and benefits are awarded, ending the inquiry. *See id.* If the process continues beyond the third step, the fourth and fifth steps consider the claimant's 'residual functional capacity' in determining whether the claimant can still do past relevant work or make an adjustment to other work. *See id.* § 416.920(a)(4)(iv)-(v)."

**MEMORANDUM DECISION AND ORDER - 10**

feet close together for at least 30 seconds." *Id.* A 6 minute walk test revealed Petitioner could walk 1,050 feet with two rest breaks, obvious fatigue and impaired balance. (AR 489.)

Petitioner was next seen on October 28, 2016, by Drew Simmons, N.P., for occupational therapy. (AR 412.) Petitioner reported that he "is independent with basically everything," but that he "can't stand for more than 5 minutes." (AR 413.) Petitioner stated to Simmons that he could walk "about 1 kilometer….walking is difficult, but standing still is more difficult," and he reportedly "loses balance after standing" for a time. He dresses himself while seated, has a shower chair, sits while cooking, and has difficulty managing his shoes. (AR 415.) Simmons referred Petitioner to Dr. Homaechevarria at St. Luke's Sports Medicine Clinic, who examined Petitioner on October 28, 2016. (AR 416.)

Dr. Homaechevarria's physical examination on October 28, 2016, revealed "obvious tight heel cord and hamstring, inability to fully extend his knee. He is unable to place his foot on the floor secondary to heel cord tightness. He has an obvious valgus alignment." (AR 416.) Dr. Homaechevarria found that Petitioner's right lower extremity deformity is secondary to Petitioner's cerebral palsy. (AR 416.) Petitioner was referred to Dr. Larry Showalter, who examined Petitioner on December 5, 2016. (AR 418.) Dr. Showalter noted Petitioner was ambulatory "with a significant equinovarus foot deformity. He has compensatory internal rotation and knee flexion deformity to

accommodate his foot deformity…his right foot is not correctable with significant equinus and varus….The right leg is smaller than the left leg." (AR 418.)

Petitioner participated in occupational and physical therapy between October 26, 2016, through March 8, 2017. (AR, Ex. 5F.) On November 14, 2016, Petitioner was prescribed a home exercise program. (AR 493.) On November 17, 2016, Randal Wraalstad, DPM, evaluated Petitioner's club-foot deformity, noting that Petitioner was at that time doing fairly well, although he exhibited some weakness of his right lower leg and was not then exhibiting "significant pain" with ambulation. (AR 499.)

Dr. Jonathan Myers evaluated Petitioner on January 11, 2017, noting "spastic equinovarus contracture in the right foot/ankle," with "Ashworth grade 3 spasticity at the left hip adductor, left hamstring, and Ashworth grade for specifity [sic][7] at the plantar flexors and inverters of the right foot." (AR 501.) Dr. Myers recommended nerve blocks for treatment of the spasticity. Dr. Myers proceeded with administering temporary nerve blocks on January 19, 2017, and destruction of the peripheral nerves using phenol neurolysis on January 27, 2017. (AR 510, 511-512.) Thereafter, Petitioner was referred on January 31, 2017, to physical therapy for gait training two times per week, and to be assessed for a new AFO.[8] (AR 513 - 514.)

---

[7] It appears Dr. Myers meant to dictate "Ashworth grade 4 spasticity" based upon the context of the note.

[8] An AFO, or Ankle-foot orthosis, is a device that helps keep the ankle joint in a neutral position. Protosthetics, https://protosthetics.com/afo/, (last visited Dec. 1, 2021).

**MEMORANDUM DECISION AND ORDER - 12**

At his physical therapy session on February 10, 2017, Petitioner had "two near falls during the 6 minute walk test," and he reported multiple near falls during a typical day. (AR 520.) Petitioner was discharged from physical therapy on March 8, 2017, after having plateaued with progress. (AR 527.) The goal of improving upon the 6 minute walk test by 10% was not met. *Id.*

Petitioner's case manager, Kathy Blamieres, completed an adult function report on April 3, 2017.[9] (AR 299.) She reported knowing Petitioner since September 15, 2016, and spending between two and six hours weekly with him. (AR 299.) She stated that she provided a shower chair so that Petitioner could bathe, and that Petitioner struggled with standing for more than five minutes. (AR 300.) She noted he is a fall risk, and that he cannot perform household chores like laundry, ironing, or cooking without being seated. (AR 301.) He reportedly stands only to load, unload, or transport items from the laundry, and that others in his household do all domestic and outdoor chores. (AR 301.) Blamieres noted Petitioner cannot maintain balance when vacuuming or doing manual labor; he uses an electric cart to shop in stores; he is dependent upon others for transportation and it would be unlikely he could operate foot pedals in a vehicle; and he needs others to accompany him due to risk of falling. (AR 305.) She explained that Refugee Programs had referred Petitioner to vocational rehabilitation, but that he "did very poorly," and that

---

[9] The following evidence and medical records post-date Petitioner's amended onset date of March 22, 2017.

**MEMORANDUM DECISION AND ORDER - 13**

Refugee Programs has been unable to find available work for him due to his medical impairments. (AR 306.)

On May 19, 2017, Petitioner was evaluated by Dr. Michael Sant, a board certified Physical Medicine and Rehabilitation specialist, upon request of the Department of Disability Services. (AR 570.) Petitioner reported pain in his right foot and ankle if standing for more than ten minutes. *Id.* Examination and testing results revealed atrophy on the right side, particularly in the right leg, and no movement in the right ankle. (AR 574.) Gait was observed to be antalgic and spastic in the right lower extremity with scissoring and equinovarus deformity, and Petitioner walked on the outside of his [right] foot. (AR 575.) In Dr. Sant's opinion, Petitioner appeared to be able to walk "short functional distances without the use of an assistive device, but would have difficulty with prolonged standing or walking. He does not appear to have any limitations to sitting….With regard to the lower limbs…he would not tolerate squatting or kneeling, prolonged weight-bearing, repetitive stairs or climbing, or prolonged standing or walking, particularly over uneven surfaces….Because of his balance issues, he should not work in unprotected heights…." (AR 575.)

Later progress notes from Petitioner's treating physicians revealed falls and an increase in pain, to the point where Petitioner became unable to ambulate without assistive devices. Emergency department records on November 27, 2017, reveal Petitioner complained of pain in his right ankle, to the point he was unable to bear weight. (AR 599.) He was prescribed crutches. (AR 600.) On December 7, 2017, Dr.

**MEMORANDUM DECISION AND ORDER - 14**

Myers examined Petitioner, and considered Petitioner a candidate for surgical

intervention. (AR 599.) Petitioner reported having a hard time walking on his right foot

and ankle, and experiencing pain with activity. (AR 599.)

On July 9, 2018, Petitioner presented to the emergency department[10] complaining

of severe right ankle pain, and that he was unable to bear weight, walk, or stand on his

right side. (AR 597 – 598.) On July 19, 2018, Petitioner was taken to the emergency

department after having experienced a syncopal episode at home resulting in a fall. (AR

592 – 593.) Upon examination, Petitioner's right ankle and right knee were painful. (AR

594.) He was again prescribed crutches to help him get around, and instructed to follow

up with Dr. Myers regarding further pain treatment. (AR 596.)

On July 26, 2018, Petitioner treated with Dr. Myers. (AR 591.) Petitioner was

using a wheelchair for mobility. (AR 591.) Dr. Myers remained of the opinion that

Petitioner required surgical intervention, and that it did not "surprise [him] that he is

unable to walk given the severe varus angulation at the ankle." (AR 592.) Dr. Myers

advised Petitioner to continue to use a wheelchair or crutches to aid in his mobility, and

he referred Petitioner to an orthopedic surgeon. (AR 592.)

Petitioner treated with orthopedic surgeon Kaitlin Neary, M.D., of Idaho Elks

Rehabilitation Hospital, on August 6, 2018. Petitioner reported that, over the past month,

his pain had increased significantly and radiated proximally up the back of his right calf

---

[10] Petitioner was brought to the emergency department by a member of his church.

**MEMORANDUM DECISION AND ORDER - 15**

into his upper leg and hip. (AR 588.) Dr. Neary's examination findings revealed severe pain with light touch diffusely over the right foot and ankle, and shooting pain proximally up the calf, thigh, and into the right buttock with light touch over the dorsal aspect of the foot. (AR 590.) Dr. Neary next examined Petitioner on November 26, 2018, and observed him using crutches to ambulate. (AR 587.) Petitioner reported being unable to bear weight on his right foot due to pain. *Id.* He was referred for an EMG to evaluate the extent of neurologic involvement of his right lower extremity. (AR 588.)

On January 17, 2019, EMG results revealed moderate to marked decreased rate of motor unit potentials throughout Petitioner's right lower extremity, consistent with upper motor neuron lesions from cerebral palsy. (AR 808.) Petitioner followed up with Dr. Neary on March 8, 2019, to discuss surgical intervention. (AR 782.) Examination findings revealed tenderness to palpitation directly over the distal fibula and just distal to his fibula where Petitioner bears weight. *Id.* Dr. Neary discussed surgical options to keep Petitioner's foot balanced in neutral, which included release of all posteromedial structures, triple arthrodesis with proximal tibia autograft and allograft, and possible closing wedge osteotomy, among other procedures. (AR 783.) The risks of surgery included nonunion, infection, the need for repeat surgery, or amputation. *Id.* Dr. Neary discussed also that, while surgery may allow Petitioner the ability to place his foot plantigrade on the ground, he could still experience pain related to his nerve hypersensitivity, his gait would remain abnormal, and he would be nonweightbearing for three months postoperatively. (AR 783.)

**MEMORANDUM DECISION AND ORDER - 16**

On May 1, 2019, Dr. Neary performed an extensive reconstruction surgery of Petitioner's right foot and ankle. (AR 725 - 735.) Petitioner was discharged from the hospital on May 31, 2019, with a home health aide, and his right leg in a cast boot. (AR 717 - 721.) He was prescribed a walker, and taught to navigate stairs in a sitting position. (AR 711.)

### 4. Analysis

The only question at issue at step three is whether Petitioner is unable to ambulate effectively. Respondent argues the answer to this question must be no, because Listing 1.02A requires the inability to walk without the use of a hand-held assistive device that limits the functioning of both upper extremities, and cites to the evidence in the record relied upon by the ALJ that Petitioner retained the ability to walk. Resp. Brief at 2-3. (Dkt. 20.) Petitioner contends that Listing 1.02A does not require such a showing, because the examples provide for other ways to show ineffective ambulation. Reply Brief at 3. (Dkt. 21.)

A plain reading of the Listing in its entirety supports Petitioner's position. Listing 1.02A does not require a finding that Petitioner is unable to walk without the use of an assistive device, such as a walker or crutches, necessarily involving the use of both hands, to qualify for disability at step three. That circumstance is merely one of several non-exclusive examples suggested in the Listing. *See* Appendix 1 at Listing 1.00B2b(2) ("examples of ineffective ambulation include, but are not limited to, the inability to walk

without the use of a walker, two crutches or two canes….."). Other examples of

ineffective ambulation include:

> 1. [T]he inability to walk a block at a reasonable pace on
> rough or uneven surfaces;
> 2. [T]he inability to use standard public transportation;
> 3. [T]he inability to carry out routine ambulatory activities,
> such as banking and shopping; and
> 4. [T]he inability to climb a few steps at a reasonable pace
> with the use of a single hand rail.

*Id*. An "[i]nability to ambulate effectively means an extreme limitation of the ability to

walk; i.e., an impairment ... that interferes very seriously with the individual's ability to

independently initiate, sustain, or complete activities." Listing 1.00B2b(1).

The overwhelming evidence in the record establishes Petitioner suffered from an

extreme limitation of the ability to walk, both before and after the amended onset date of

March 22, 2017, and that his condition lasted for more than twelve months. The ALJ and

Respondent place undue emphasis on Petitioner's optimistic statements to providers in

2016 that he could stand for 20 minutes and walk ½ mile (or one kilometer), and

observations by providers in 2016 that he did, in fact, ambulate. This monocular view of

the evidence ignores not only the objective evidence of Petitioner's abilities in 2016, but

also <u>all</u> of the evidence following Petitioner's amended onset date of March 22, 2017,

which establishes conclusively that Petitioner's condition worsened after 2016. Further,

there is nothing to support the ALJ's conclusory finding that Petitioner's walking and

standing ability will be improved following reconstructive surgery on May 1, 2019. The

Court will explain.

**MEMORANDUM DECISION AND ORDER - 18**

Prior to the amended onset date of March 22, 2017, Petitioner was observed walking with obvious difficulty due to severe deformity of Petitioner's right lower extremity. A standing test administered on October 27, 2016, revealed Petitioner could not stand for longer than 30 seconds, and a six minute walk test revealed Petitioner could walk 1,050 feet,[11] but that he required two rest breaks and exhibited impaired balance. The ALJ did not acknowledge these observed difficulties at all.

The third party statement by Petitioner's case worker, Kathy Blamiers, corroborated Petitioner's testimony that he could not shower, cook, perform household chores, or dress himself below the waist without using a chair, and that Petitioner struggled to stand for more than five minutes. Blamiers stated also that Petitioner could not leave his home unaccompanied because he could not drive, and he was at risk of falling. Petitioner was later observed by his physical therapist having two near falls during a six minute walk test administered on February 10, 2017. Petitioner never achieved improvement on the six minute walk test despite physical therapy sessions through March 8, 2017.

Even prior to the amended onset date, having the ability to walk for six minutes with observed balance issues, or the ability to walk 1,050 feet with two rest breaks and impaired balance, is not consistent with the ability to walk at a "reasonable pace." Listing 1.00B2b. When viewed together with the requirement that a claimant "must be capable of

---

[11] 1,050 feet is equivalent to approximately .2 miles, or .32 kilometers.

MEMORANDUM DECISION AND ORDER - 19

sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," the substantial evidence in the record prior to the amended onset date compels a finding Petitioner was not able "[t]o ambulate effectively." *Id*. The evidence established also that Petitioner's inability to walk "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities," and that Petitioner could not travel without being accompanied due to his risk of falling. Listing 1.00B1, 1.00B2b(2).

Following Petitioner's amended onset date of March 22, 2017, Petitioner's condition worsened to the point he sought care at the emergency department on November 27, 2017, July 9, and July 19, 2018.[12] Dr. Sant evaluated Petitioner's walking ability on May 19, 2017, and was of the opinion Petitioner could walk "short functional distances without the use of an assistive device, but would have difficulty with prolonged standing or walking." This opinion is consistent with Blamiers' observations that Petitioner could carry a laundry basket within his home, but required assistance to shop in stores, needed a chaperone outside the home to prevent falls, and otherwise could not walk sufficiently to carry out routine ambulatory activities, such as vacuuming.

After falling at home on July 19, 2018, Petitioner was prescribed crutches. He later was observed using a wheelchair on July 26, 2018. Dr. Neary's physical examinations on August 6, 2018, November 26, 2018, and March 8, 2019, revealed severe pain to light

---

[12] This evidence alone rebuts Respondent's argument that Petitioner did not require the use of an assistive device to walk. Listing 1.02B2b.

**MEMORANDUM DECISION AND ORDER - 20**

touch and tenderness to palpitation in the area where Petitioner bears weight on his ankle. This evidence post-dating Petitioner's amended onset date clearly and unequivocally established Petitioner could not walk without the use of two crutches or a walker, thus satisfying yet another example of an inability to ambulate. Listing 1.00B2b(2).

Finally, the ALJ's conclusory comment that Petitioner's surgery in May of 2019 would improve his walking and standing ability, presumably to the extent that Petitioner's impairment will no longer satisfy the listing requirements, has no evidentiary support in the record.[13] Following Petitioner's May 1, 2019 surgery, Petitioner was required to be non-weightbearing for three months, and to wear a cast boot. He was discharged with a walker and could not navigate stairs unless from a seated position. He had assistance from a home health aide. There is no evidence concerning Petitioner's expected prognosis other than Dr. Neary's records, wherein she explained to Petitioner that he could face future complications, including amputation, and that the best possible prognosis may be only the ability to place the previously deformed foot plantigrade on the ground with pain. Even if the ALJ's unsupported assumption turns out to be true

---

[13] The ALJ conducted the hearing in this matter on June 20, 2019.

sometime in the future,[14] that does not change the evidence in the record that, between March 22, 2017, and the date of the ALJ's written determination on July 15, 2019, the objective medical evidence established Petitioner could not "ambulate effectively" as described in Listing 1.00B2a and b.

The Court finds Petitioner clearly carried his burden of proof at step three. *Bowen*, 482 U.S. at 141. The record is replete with objective medical evidence of Petitioner's inability to ambulate effectively. The ALJ erred, not only in his findings of fact, but also as a matter of law. The Court finds Petitioner established that his impairments resulting in severe deformity of his right lower extremity and ankle meet the criteria of Listing 1.02A of Appendix 1.

"The reason for [the] difference between the listings' level of severity and the statutory standard is that…the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "If the claimant has an impairment that meets the medical criteria of a listed

---

[14] The Court also is perplexed by the ALJ's seeming inconsistent finding at step five that the "use of a wheelchair, four-wheeled walker, or leg brace/cast would not preclude" the jobs identified by the vocational expert that Petitioner could presumably perform. If Petitioner must use a wheelchair or a walker to ambulate, and he otherwise meets the requirements of Listing 1.02A status post reconstructive surgery of his right ankle and lower extremity (gross anatomical deformity, joint pain and stiffness, and medical imaging of ankylosis or bony destruction), Petitioner would still be presumptively disabled at step three. Also, the extensive reconstructive surgery of Petitioner's right foot and ankle may require consideration under Listing 1.03, which presumes disability when there has been "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."

**MEMORANDUM DECISION AND ORDER - 22**

impairment, the claimant is presumptively disabled, and no further inquiry is necessary." *Bowen v. Yuckert*, 482 U.S. at 141. The Court finds Petitioner is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 404.1520(d).

The Court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the Court determines that the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which Petitioner is entitled, reversal is appropriate. *Benecke v. Barnhart*, 379 F.3d 587, 596 (9th Cir. 2004). Remand to the Commissioner for another hearing is neither necessary nor appropriate in this case. The Court finds Petitioner carried his burden at step three, and is disabled and entitled to benefits. Reversal is the appropriate remedy at this juncture. *Id.*

## CONCLUSION

Because there is no remaining issue that must be resolved and it is clear from the record that Petitioner is entitled to disability benefits, the Court will reverse the decision of the Commissioner and remand with instructions for an award of benefits.

**MEMORANDUM DECISION AND ORDER - 23**

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      The Petition for Review (Dkt. 1) is **GRANTED**.

2)      This action shall be **REMANDED** to the Commissioner for an
award of benefits.

3)      This Remand shall be considered a "sentence four remand,"
consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852,
854 (9th Cir. 2002).

DATED: December 01, 2021

Candy W. Dale
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 24**